UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

NOELLE HANRAHAN, et al.,

    Plaintiffs

v.

GARY C. MOHR, et al.,
    Defendants.

Case No. 2:13-cv-1212
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Preston Deavers

## OPINION AND ORDER

This matter is before the Court on Defendants Gary C. Mohr and JoEllen Smith's ("Defendants") Motion for Summary Judgment. (ECF No. 32.) For the reasons that follow, Defendants' motion is **GRANTED in part** and **DENIED in part** in accordance with this Opinion and Order.

### I. BACKGROUND

#### A. Factual Background

Plaintiffs Siddique Abdullah Hasan, Gregory Curry, Keith LaMar, Jason Robb, and George Skatzes ("Prisoner Plaintiffs") are prisoners who were convicted of crimes committed during the Lucasville prison riot, described *infra*. Plaintiffs Noelle Hanrahan, Christopher Hedges, Derrick Jones, and James Ridgeway ("Media Plaintiffs") unsuccessfully sought face-to-face and video recorded interviews with Prisoner Plaintiffs. Defendant Gary Mohr is the Director of the Ohio Department of Rehabilitation & Correction ("ODRC"), and Defendant JoEllen Smith is the Communications Chief of the ODRC ("Defendants").

In April of 1993, a prison riot erupted at the Southern Ohio Correctional Facility known as the Lucasville Prison. The catalyst for the riot was an impending tuberculosis test. Prison officials planned to use a method of testing that utilized an injection containing alcohol. Some

1

inmates believed that the alcohol in the injection would violate Muslim prisoners' religious beliefs. News that the prison would provide no exemptions or alternatives to the required test caused a significant disturbance in the Lucasville prison, which eventually led to a full-out riot.

The riot began when prisoners overpowered a prison guard and took his keys, which gave the prisoners access to a portion of the prison. Prisoners attacked and overpowered the remaining guards in that portion of the prison. The prisoners gained complete control over the L-block of the prison and held a dozen guards hostage. The standoff between these prisoners and the outside world lasted eleven days. During those eleven days, one guard and nine prisoners were murdered and many more were injured.

In the aftermath, journalists sought interviews with the prisoner leaders of the riot. Prison officials denied an interview request for a non-plaintiff journalist from the *Columbus Dispatch* to interview Prisoner Plaintiff Hasan in February 2003. The journalist told Hasan, "prisons chief Reginald Wilkinson decided no inmates convicted of [Lucasville] riot crimes will be permitted to speak to us." (Complaint ("Compl.") ¶ 19(a), ECF No. 1.) Officials again denied a non-plaintiff journalist's interview request with Prisoner Plaintiff Hasan in June 2005 because "[i]nterviews with general population inmates are discretionary by policy and we do not grant interviews with Level 5 (security level of [Hasan]) inmates." (*Id.* ¶ 19(b).) Officials also indicated that they "also limit any interview to discussions about their offense or a topic not related to prison policy or procedure." (*Id.*)

All Ohio inmates are assigned a numerical security classification from level 1 through level 5, with 1 the lowest security risk and 5 the highest. *Wilkinson v. Austin*, 545 U.S. 209, 125 S. Ct. 2384. 2389 (2005). Inmates with security classifications of levels 4 and 5 are considered restricted population inmates. (Inmate Security Classification Levels 1 through 4, Number 53-

2

CLS-01, January 2, 2013, Defs. Ex. B at 168–69.) Level 5 is defined as a "security level for inmates who commit or lead others to commit violent, disruptive, predatory, riotous actions, or who otherwise pose a serious threat to the security of the institution as set forth in the established Level 5 criteria." (*Id.* at 168–67.) Inmates with security classifications of levels 1, 2, and 3 are considered general population inmates. (*Id.* at 168.) Inmates on death row can be general population or restricted population inmates depending on any particular inmate's security level. (Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Defs. Reply") at 4, ECF No. 36.)

Warden Houk denied another non-plaintiff journalist's interview request with Prisoner Plaintiffs Hasan and Robb in November 2006 because "[o]ur research of your background leads us to believe that your visit with the inmates mentioned above, is for research purposes relating to your play 'Lucasville: The Untold Story of a Prison Uprising'. We will not facilitate any media, visit, or research opportunity, with the aforementioned inmates, due to their security level." (Compl. ¶ 19(c).)

In February 2013, Defendant Smith denied a request by Media Plaintiff Hanrahan to interview Prisoner Plaintiffs Curry, Hasan, LaMar, Robb, and Skatzes because "[w]e base our decisions on inmate interviews on a number of different screening criteria, including the overall safe operation of the facility and potential impact on crime victims, etc." (*Id.* ¶ 20(a).) Defendant Smith denied Media Plaintiff Jones's request to interview Skatzes, Curry, LaMar, Hasan, and Robb later in February 2013 because "[i]nmates who are classified as Level 5 inmates are not eligible for interviews. In addition, [w]e base our decisions on inmate interviews on a number of different screening criteria, including the overall safe operation of the facility and potential impact on crime victims, etc." (*Id.* ¶ 20(b).) Officials denied similar requests for interviews with

3

Prisoner Plaintiffs three times in March 2013 and three times in April 2013, citing varying reasons, including that ODRC did not permit Level 5 inmates to be interviewed.[1] (*Id.*)

According to the Complaint, although they have always denied in-person interviews of the Prisoner Plaintiffs, prison officials have permitted many media requests for face-to-face interviews of other prisoners who are on death row. (*Id.* ¶ 21.) Moreover, Plaintiffs contend that ODRC permitted one filmmaker to interview and film prisoners who were confined in the Ohio State Penitentiary ("OSP") Ohio's super-max security prison at the highest level of security (now Level 5). (*Id.* ¶¶ 40, 61(b).)

The Ohio Administrative Code permits media visits subject to time, place, and manner restrictions.[2] ODRC, however, has two separate media policies. Policy 01-COM-09 applies to

---

[1] Prisoner Plaintiff George Skatzes is not on Level 5 Security and is in general population at Chillicothe Correctional Institution. (Compl. ¶¶ 16, 20(i), ECF No. 1.)

[2] Section 5120-9-16 of the Ohio Administrative Code is captioned "News media visits." Administrative Rule 5120-9-16, effective April 1, 2009, provides in full:

- (A) It is the policy of the department of rehabilitation and correction to permit visits by representatives of the news media to correctional institutions, when approved by the managing officer of the particular institution or his designee.

- (B) The managing officer or his designee may place reasonable restrictions on the number of reporters allowed in the institution at any one time and on the duration of their visits.

- (C) Arrangements for the use of photographic, recording or broadcast equipment or for interviews must be made in advance.

    - (1) Pictures or recorded interviews of specific inmates may be taken only after securing clearance from the managing officer or his designee and only after the inmate to be photographed has expressed his approval by signing the inmate consent form.

    - (2) The managing officer or his designee may place reasonable restrictions on the frequency, length, and starting time of personal interviews. The institution will visually monitor such interviews to assure the reporters' safety.

- (D) If an institution is placed under a state of emergency, representatives of the news media will be allowed access only to those areas that are designated by the managing officer or his designee. During the existence of a state of emergency, the director or his designee shall inform the news media of the situation within the institution as releasable information becomes available.

Ohio Admin. Code 5120-9-16. Media Policy-Death Row and Executions, 01-COM-13 and Media Policy 01-COM-09 provide in relevant part "Inmates must not be in a restricted population as defined by Department Policy 53-CLS-01 . . . in order to be eligible for a media interview." (Defs. Ex. B at 143, 163, ECF 31-2.)

4

prisoners who are not under sentence of death and thus applies to Prisoner Plaintiff Curry. Policy 01-COM-13 applies to prisoners on death row. That policy distinguishes between death row prisoners who have a scheduled execution date and those who do not. The policy for prisoners who do not have a scheduled execution date apply to the remaining Prisoner Plaintiffs: Hasan, LaMar, Skatzes, and Robb.

Prisoner Plaintiffs Hasan, LaMar, Robb, and Curry are all considered Level 5 Security inmates and as such are part of the restricted population. (Compl. ¶¶ 12–15.) Prisoner Plaintiffs Hasan, LaMar, Robb, and Curry are all housed at OSP. OSP is a 'supermax' facility, designed to segregate the most dangerous prisoners from the general prison population. *Wilkinson*, 545 U.S. at 2388. Prisoner Plaintiff Skatzes has been housed in general population at the Chillicothe Correctional Institution since May 26, 2000 and therefore is not a level 5 security inmate or a member of the restricted population. (Compl. ¶¶ 16, 20(i).) Defendants allow face-to-face and video recorded interviews on a discretionary basis with prisoners who are part of the general population. (Defendants' Motion for Summary Judgment ("Defs. Mot.") at 1, ECF No. 32.). Death row inmates are housed in general population and restricted population settings depending on their security level. (Defs. Reply at 4 ("death row inmates are not necessarily restricted population, just as restricted population inmates are not necessarily on death row.").)

### B. Procedural Background

Plaintiffs filed this action on December 9, 2013. They assert that Defendants engaged in content-based discrimination and unreasonable restrictions on public access in violation of the First and Fourteenth Amendments. Plaintiffs also contend that the Defendants violated Due Process and Equal Protection guarantees in the Fourteenth Amendment because there is no rational basis for the interview restrictions. Plaintiffs bring these claims under 42 U.S.C. § 1983.

5

On March 18, 2014, Defendants filed a motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c). (ECF No. 11.) The Court issued an Opinion & Order on March 31, 2015 denying Defendants' motion, holding that the Media Plaintiffs had standing and sufficiently stated a claim at the pleading stage. (Opinion at 8, 12, ECF No. 17.) The Court further held that the Prisoner Plaintiffs sufficiently alleged that Defendants denied media-access requests from each plaintiff within the limitations period, and that Defendants' exhaustion arguments were premature at that stage. (*Id.* at 14–15.)

Defendants filed their Motion for Summary Judgment on January 30, 2017. (ECF No. 32.) Defendants contend that the Prisoner Plaintiffs have failed to exhaust their administrative remedies and that their claims are barred by the statute of limitations. Defendants further argue that both the Media Plaintiffs and Prisoner Plaintiffs have failed to state a claim for relief because the United States Constitution does not provide a First or Fourteenth Amendment right to face-to-face interviews with Prisoner Plaintiffs.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party, who has the burden of proof at trial, fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

6

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (internal quotations omitted). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby, Inc.*, 477 U.S. at 251–52.

### III. ANALYSIS

**A. Defendants May Impose Neutral Restrictions on Media Access So Long As Prisoners Have Alternative Channels of Communication.**

To prevail on a claim under 42 U.S.C. § 1983, both Media Plaintiffs and Prisoner Plaintiffs must establish two elements: "(1) deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008) (citing *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 463 (6th Cir. 2006)). Plaintiffs argue that Media Plaintiffs, acting as agents for the public, have a First and Fourteenth Amendment right to on-camera interviews with Prisoner Plaintiffs to ensure adequate and fair reporting. In their motion for summary judgment, Defendants contend that Media Plaintiffs have failed to establish that the

7

denial of face-to-face and video recorded interviews violates their constitutional rights.

Inmates retain constitutional rights to freedom of speech and due process of law, although challenges to prison restrictions that are asserted to inhibit such rights "must by analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed." *Pell v Procunier*, 417 U.S. 817, 822 (1974). In *Pell*, the Supreme Court declared that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.* Since prisoners retain at least some constitutional rights, where those guarantees are infringed, the federal courts have a substantial interest in protecting them. *Main Road v. Aytch*, 522 F.2d 1080, 1086 (3rd Cir. 1975) (finding unconstitutional prison regulations that allow for control of the content of speech through the grant or denial of permission for inmates to speak with reporters); *Procunier v. Martinez*, 416 U.S. 396, 40506, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) ("When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.").

In *Saxbe v. Washington Post Co.*, 417 U.S. 843 (1974), decided the same day as *Pell*, the Washington Post and one of its reporters brought an action to challenge the constitutionality of regulations prohibiting press interviews with prisoners. The Court discussed the developed record which included evidence demonstrating that prison officials feared inmates who were publicized because of their repeated contact with the press would gain a disproportionate degree of notoriety and would become a substantial disciplinary problem within the institution. *Id.* at 848–49. The Court nevertheless held as follows:

> In this case, however, it is unnecessary to engage in any delicate balancing of
> such penal considerations against the legitimate demands of the First Amendment.

8

> For it is apparent that the sole limitation imposed on newsgathering by Policy Statement 1220.1A is no more than a particularized application of the general rule that nobody may enter the prison and designate an inmate whom he would like to visit, unless the prospective visitor is a lawyer, clergyman, relative, or friend of that inmate. . . .
>
> We find this case constitutionally indistinguishable from *Pell v. Procunier*, 417 U.S. 817 (1974), and thus fully controlled by the holding in that case. "(N)ewsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public." *Id.* at 834. The proposition "that the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally . . . finds no support in the words of the Constitution or in any decision of this Court." *Id.* at 834–35. Thus, since Policy Statement 1220.1A "does not deny the press access to sources of information available to members of the general public," *id.*, at 835, we hold that it does not abridge the freedom that the First Amendment guarantees.

*Saxbe*, 417 U.S. at 849–50. However, a divided Supreme Court later narrowed the holding from *Saxbe*. *See Houchins v. KQED, Inc.*, 438 U.S. 1 (1978) (dismissing a media plaintiff's claim against sheriff who denied him access to the county jail after prisoner committed suicide, reasoning that the public was not allowed to bring recording devices into the jail.).

In *Houchins*, in which only seven justices took part, Justice Stewart concurred in the judgment of the three-justice majority, but agreed with the three dissenting justices that at least some limited injunctive relief was warranted in favor of media plaintiffs. *Id.* at 17.[3] He wrote that "terms of access that are reasonably imposed on individual members of the public may, if they impede effective reporting without sufficient justification, be unreasonable as applied to journalists who are there to convey to the general public what the visitors see." *Id.* Justice Stewart agreed with the district court that simply giving the press the same access to prisoners as the general public did not satisfy the media's First and Fourteenth Amendments rights. Instead,

---

[3] "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977). Thus, Justice Stewart's concurring opinion provides the holding in *Houchins*.

9

he reasoned, the press should be given more flexible access and be permitted to bring cameras and recording equipment as necessary for effective presentation to the viewing public of the conditions at the jail. *Id.* at 18. Such access, however, is not unlimited in scope. Justice Stewart agreed that the preliminary injunction giving members of the press prison access was overbroad because it allowed them into areas not open to the public and required that they be allowed to interview randomly encountered inmates. *Id.*

While acknowledging the limitations on inmates' constitutional rights, it also is clear that the First Amendment precludes prisons from regulating, through the grant or denial of permission for prisoners to talk with reporters, the content of speech which reaches the news media. *Main Road v. Aytch*, 522 F.2d at 1086–87. However, where restrictions are applied uniformly as systemwide rules and prisoners retain sufficient alternative channels of communication, prisons can permissibly restrict face-to-face and video recorded interviews. *Hammer v. Ashcroft*, 570 F.3d 798, 800 (7th Cir. 2009) (Interpreting *Pell* and *Saxbe* to "establish that the Bureau of Prisons could enforce a systemwide rule against personal or video interviews between prisoners and reporters."); *Pell v. Procunier*, 417 U.S. at 828 ("So long as this restriction operates in a neutral fashion, without regard to the content of the expression, it falls within the 'appropriate rules and regulations' to which 'prisoners necessarily are subject' . . . and does not abridge any First Amendment freedoms retained by prison inmates."); *Turner v. Safley*, 482 U.S. 78, 89 (1987) ("when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.").

### 1. ODRC Media Policy Restrictions on Restricted Population Inmates Are Permissible.

This Court previously held that without a record it was premature at the pleading stage to decide whether the "terms of access are reasonably imposed" or if the prisons at issue provide

10

"substantial press and public access to the prison." (Opinion at 12, ECF 17.) Now, in support of their motion for summary judgment, Defendants offer copies of ODRC policies and the declarations of several individuals and proposed expert witnesses. Defendants primarily argue that banning on-camera interviews to Prisoner Plaintiffs is reasonable given their dual concerns for the potential impact on the families of riot victims and prison security. (Defs. Mot. at 20.)

ODRC Media Policies prohibit all prisoners classified as part of the restricted population from participating in face-to-face or video recorded interviews. (Defs. Ex. H at 1 ("At present there are 358 inmates incarcerated at the Ohio State Penitentiary who according to ODRC Policy 01-COM-03 'Media Policy' are not eligible for on-camera media access."), ECF No. 36-1.) Accordingly, Prisoner Plaintiffs Hasan, Curry, Robb, and Lamar, as well as all other restricted population prisoners incarcerated at OSP are ineligible for face-to-face and video recorded interviews. (Defs. Reply at 3.)

However, restricted population inmates are not denied meaningful access to the media. Instead, the policies allow restricted population prisoners alternative channels of communication with the media. Restricted population inmates are permitted to send out letters and make direct phone calls. (Defs. Mot. at 3.) The Prisoner Plaintiffs have been permitted to utilize these channels of communication. At least one of the Prisoner Plaintiffs participated live on a nationally-broadcast radio program on Nation Public Radio by directly calling into the program. (Defs. Ex. F at 6, ECF No. 32-6.)

Prisoner Plaintiffs Hasan, LaMar, Robb, and Curry are all classified as security level 5 inmates and are therefore part of the restricted population. (Compl. ¶¶ 12–15); (Defs. Mot. at 1–2.) As Plaintiffs provide no evidence that the Prisoner Plaintiffs are treated differently from other restricted population inmates by Defendants' denial of face-to-face or video recorded interviews,

11

the Defendants' arguments to dismiss Prisoner Plaintiffs Hasan, LaMar, Robb, and Curry are well taken. As a result, Defendants' are entitled to summary judgment on Prisoner Plaintiffs Hasan, LaMar, Robb, and Curry's claims.

### 2. Prisons May Not Regulate Inmates' Communications with Reporters Based Upon the Anticipated Content of Such Interviews.

Prisoner Plaintiff Skatzes has been part of the general population since May 2000. (Compl. at ¶ 39.) As Defendants admit, Prisoner Plaintiff Skatzes "continues to be denied on-camera media interviews both because of concerns for his riot victims and because he continues to pose a serious threat to the security of the institution. (Defs. Mot. at 16 n.7.) While the Court has the greatest regard for the feelings of the victims and victims' families, as articulated in *Snyder v. Phelps*, speech cannot be restricted because it is upsetting or arouses contempt. 562, U.S. 443, 458 (2011) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.") (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

In regards to Defendants' security concerns, Defendants argue that allowing media access to a select group of inmates tends to give those inmates disproportionate notoriety and influence over their inmate peers, creating an increased security risk. (Defs. Mot. at 15.) Defendants' emphasize that in the prison environment particularly, "any form of protest has the ability to quickly devolve into a disruptive, potentially deadly incident." (*Id.* at 17.) Defendants further point to Media Policy 01-COM-09 (VI)E(11) to justify denying Prisoner Plaintiff Skatzes the ability to have a face-to-face or video recorded interview with the Media Plaintiffs based on his mental health issues. (Defs. Reply at 3.)

Previously, Defendants justified their denial of face-to-face and recorded interviews with Prisoner Plaintiff Skatzes based on his participation in the Lucasville riot and the victim impact

12

of any potential interviews. On February 8, 2013, Media Plaintiff Hanrahan wrote Defendant Smith "Please let me know your reason for denying my interview request." (Pls. Ex. C at 16, ECF No. 35-1.) Defendant Smith responded "We base our decisions on inmate interviews on a number of different screening criteria, including the overall safe operation of the facility and potential impact on crime victims, etc." (*Id.*) On February 26, 2013, Media Plaintiff Jones wrote Defendant Smith "can you indicate why the access is denied?" Defendant Smith responded, "Inmates who are classified as Level 5 inmates are not eligible for interviews. In addition, [w]e base our decisions on inmate interviews one a number of different screening criteria, including the overall safe operation of the facility and potential impact on crime victims, etc." (*Id.* at 29.)

At no point did the Defendants point to Prisoner Plaintiff Skatzes mental health as a justification for not allowing him to interview face-to-face with the Media Plaintiffs or be recorded during that interview.[4] Moreover, Defendant Smith in part denied an in person interview with Prisoner Plaintiff Skatzes based on the Defendants' policy of not allowing restricted population inmates to conduct such interviews. However, at that time Prisoner Plaintiff Skatzes had already been reclassified to a general population inmate.

General population inmates are allowed face-to-face and video recorded interviews. (Defs. Mot. at 1.) As to Defendants' argument that Prisoner Plaintiff Skatzes is prohibited from such interviews due to his involvement with the Lucasville riots, (Defs. Mot. at 16 n.7.), Defendants do not offer evidence for their theory that allowing Prisoner Plaintiff Skatzes to conduct face-to-face or video recorded interviews communicated to persons outside of prison could impact internal prison security any more than other general population inmate face-to-face or video recorded interviews. Additionally, Plaintiffs argue that this purported rationale is

---

[4] The Court recognizes that a person's mental health status is not static. The record does not indicate that any sort of significant change in Skatzes's mental health has occurred since 2013.

13

undermined because it is selectively enforced against the riot prisoners and is thus underinclusive. (Pls. Resp. at 17.)

As a result, there is a genuine issue of material fact as to whether the reasons for a denial of face-to-face or video recorded interviews or whether the restrictions are unlawful. Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment as to Prisoner Plaintiff Skatzes' claims.

### B. Prisoner Plaintiffs' Claims Are Not Barred Due to Any Procedural Requirements.

Defendants also contend the Prisoner Plaintiffs failed to comply with the statute of limitations and failed to exhaust administrative remedies. First, the Court previously denied Defendants' request to dismiss Prisoner Plaintiffs' claims as time barred. (Opinion at 14 ("Thus, given that Plaintiffs allege that Defendants denied media-access requests from each of the Prisoner Plaintiffs within the limitations period, the [Court] finds Defendant's request to dismiss Prisoner Plaintiffs' claims as time barred unavailing.").) As this Court already disposed of this argument and because Defendants' new contentions do not change the Court's decision, Defendants' motion for summary judgment is **DENIED** in this respect.

Second, Defendants posit that Prisoner Plaintiffs' claims are barred because they failed to exhaust their administrative remedies prior to filing this action. (Defs. Mot. at 5.) This Court previously held at the pleading stage that Defendants' exhaustion argument was premature, concluding that Plaintiffs were not required to affirmatively plead exhaustion in their Complaint. (Opinion at 14, ECF No. 17.) Defendants now argue that Prisoner Plaintiffs failed to proceed beyond step one of the three-step grievance procedure,[5] and also because their informal

---

[5] It appears that Prisoner Plaintiff Skatzes did not file any grievance. (Ex. D to Declaration of Chief Inspector ("Chief Ins. Dec."), ECF No. 32-4.)

14

complaints only referred to Warden Bobby rather than specifically identifying Defendants Mohr and Smith.

The Prison Litigation Reform Act ("PLRA") exhaustion provision, titled "Suits by prisoners," provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Under § 1997e(a), prisoners are required to exhaust "[a]ll available remedies" prior to instituting a § 1983 action. *Porter v. Nussle*, 534 U.S. 516, 524 (2002) (internal quotation marks and citations omitted).

However, inmates are only required to exhaust grievable matters. Ohio Admin. Code § 5120-9-31(B). The Ohio Administrative Code provides in relevant part:

> The inmate grievance procedure will not serve as an additional or substitute appeal process for hearing officer decisions, rules infractions board decisions or those issues or actions which already include an appeal mechanism beyond the institutional level or where a final decision has been rendered by central office staff. Other matters that are not grievable include complaints unrelated to institutional life, such as legislative actions, policies and decisions of the adult parole authority, judicial proceedings and sentencing or complaints whose subject matter is exclusively within the jurisdiction of the courts or other agencies.

Ohio Admin. Code § 5120-9-31(B).

Here, Plaintiffs argue that Prisoner Plaintiffs were not required to exhaust all available administrative remedies because Ohio Administrative Code § 5120-9—31(B) provides that final decisions rendered by a member of the Central Office staff are not grievable. (Plaintiffs' Response to Defendants' Motion for Summary Judgment ("Pls. Resp.") at 24, ECF No. 35.)

Requests to interview the Prisoner Plaintiffs were made by the Media Plaintiffs. (Compl. ¶¶ 19a–c, 20a–j.) For example, Defendant Smith denied a request by Media Plaintiff Hanrahan to interview the Prisoner Plaintiffs in February 2013 and in the same month also denied Media

15

Plaintiff Jones's request to interview the Prisoner Plaintiffs. (*Id.* ¶ 20(a)&(b).) In March 2013 and April 2013 Defendants continued to deny similar requests to interview the Prisoner Plaintiffs. (*Id.*)

The parties do not dispute that Defendants Smith and Mohr are Central Office staff. Defendants' denials of Media Plaintiffs' requests to interview the Prisoner Plaintiffs constitute final decisions. Because Media Plaintiffs already received final decisions with respect to the same matter, there would be no purpose served for Prisoner Plaintiffs to pursue the same requests. Therefore, under Ohio Admin. Code § 5120-9-31(B), Prisoner Plaintiffs did not have grievable issues they were required to appeal through the administrative process.

Accordingly, Defendants' motion for summary judgment on Prisoner Plaintiff Skatzes' claims for failure to exhaust administrative remedies is **DENIED**.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion (ECF No. 32) is **GRANTED in part** and **DENIED in part**.

**IT IS SO ORDERED.**

3-24-2017
DATE

EDMUND A. SARGUS, JR.
**CHIEF UNITED STATES DISTRICT JUDGE**

16